IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NOREEN L. BROOKS, | ) | CASE NO. 5:12CV636 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Noreen L. Brooks ("Plaintiff" or "Brooks") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title

XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).  As discussed below, the final decision of the Commissioner should be **REVERSED**

**and REMANDED** because the Administrative Law Judge failed to assign any weight to the

opinion of Brooks' treating physician and failed to provide good reasons for discounting that

opinion.

## I.  Procedural History

On August 6, 2007, Brooks filed applications for SSI and DIB, alleging a disability onset

date of July 22, 2003.[1]  Tr. 119-26, 127-29.  Brooks claimed that she was disabled due to a

combination of impairments, including high blood pressure, stroke, high cholesterol, arthritis in

the knees, sleep apnea, reflux, campylobacter infectious diarrhea, diabetes, and depression.  Tr.

---

[1]  At the administrative hearing, Brooks amended her alleged onset date of disability to May 27, 2005.  Tr. 43-45,
48-49.

85-88, 89-91, 92-95, 96-98.  The state agency denied Brooks' claims initially and upon

reconsideration, and she timely requested a hearing before an administrative law judge.  Tr. 92-

95, 96-98, 103-06, 107-10, 111-12.  On September 1, 2010, a hearing was held before

Administrative Law Judge Pamela E. Loesel (the "ALJ"). Tr. 40-77.  On October 26, 2010, the

ALJ issued a decision finding that Brooks was not disabled.  Tr. 10-20.  Brooks requested review

of the ALJ's decision by the Appeals Council on December 23, 2010.  Tr. 6.  On January 27,

2012, the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-5.

## II.  Evidence

### A.  Background

Brooks was born on February 14, 1959, and was 51 years old on the date of the ALJ's

decision.  Tr. 20, 187.  She completed 10th grade and worked previously as a housekeeper and

cafeteria worker.  Tr. 68-69.

### B.  Medical Evidence

On November 1, 2006, state consultative examiner Frederick Leidal, Psy.D., evaluated

Brooks for a prior disability claim.  Tr. 283-89.  Dr. Leidal stated that Brooks had difficulty

answering his questions during the examination and that she often contradicted herself during the

examination.  Tr. 286.  Dr. Leidal noted that Brooks' motivation "appeared at least fair and there

was no overt evidence of symptom magnification."  Tr. 285.  He opined that Brooks was

markedly impaired in: (a) relating to others in an appropriate manner; (b) maintaining attention

and concentration to simple work-related tasks and pace in task completion; and (c) maintaining

employment, adapting to the work environment and tolerating work stressors, and completing a

normal work day.  Tr. 289.

On November 16, 2006, state consultative examiner Lisa Schroeder, M.D., examined Brooks.  Tr. 293-300.  Brooks complained of bilateral knee pain, hypertension, diabetes, high cholesterol, depression, gastroesophageal reflux disease ("GERD"), enlarged heart, history of transient ischemic attack, and chronic obstructive pulmonary disease ("COPD").  On examination, Dr. Schroeder found that Brooks had difficulty with ambulation and moving up and down off the exam table.  Tr. 295.  She diagnosed bilateral knee pain with exacerbation of osteoarthritis, COPD under fair to good control, GERD under poor control with noncompliance, and diabetes under poor control.  Tr. 295.  She also found that Brooks had a poor ability to learn a new trade because of below average cognition.  Tr. 295.

On December 13, 2006, J. Patrick Flanagan, M.D., and Travis Murray, M.D. evaluated Brooks for her knee pain at the St. Thomas Hospital Orthopedic Clinic.  Tr. 472.  Dr. Murray noted no significant swelling, good range of motion with minor crepitus bilaterally, and joint stability.  Tr. 472.  X-rays of the knees showed no fracture or dislocation, normal joint space, no significant soft tissue abnormality, and no significant bone-on-bone pathology.  Tr. 472.  He diagnosed bilateral knee degenerative joint disease and gave Brooks injections of Kenalog, Sensorcaine, and Lidocaine to her knees. Tr. 472.

Brooks returned to Dr. Murray on January 26, 2007, and reported that she had a few days of relief following her injections but that her knees still hurt when she was on them for a while or when she climbed stairs.  Tr. 471.  On exam, Dr. Murray noted medial tenderness to palpation but no instability.  Tr. 471.  He diagnosed degenerative joint disease versus possible degenerative meniscal tears and ordered an MRI.  Tr. 471.  He also stated that Brooks could undergo a work training program or work as long as she did not do prolonged standing or walking.  Tr. 471.

On April 6, 2007, state agency reviewing psychologist Alice Chambly, Psy.D., determined that there was insufficient evidence to complete a Psychiatric Review Technique Form or evaluate how Brooks' mental health affected her functioning.  Tr. 301.  Dr. Chambly found inconsistency in Brooks' presentation at the consultative examination versus the evidence in the record, including that the agency application documentation listed her education level as one year of college but she reported to Dr. Leidal that she had only a tenth-grade education in special education classes.  Tr. 303 (see Tr. 163 listing one year of college).  Dr. Chambly addressed Dr. Leidal's 2006 evaluation of Brooks and explained that she afforded Dr. Leidal's opinion no weight because Brooks' statements, upon which Dr. Leidal's opinion was based, were not credible.  Tr. 313.

On April 10, 2007, state agency reviewing physician Diane Manos, M.D., assessed Brooks' physical residual functional capacity ("RFC").  Tr. 315-22.  She opined that Brooks could: (a) lift/carry 20 pounds occasionally and lift/carry 10 pounds frequently; (b) stand/walk/sit for about six hours per workday; and (c) kneel and crawl occasionally.  Tr. 316-18.  She stated that her assessment was based on objective physical findings and affirmed that Brooks' statements were not credible due to numerous discrepancies in the record.  Tr. 316, 320.  She also found that Dr. Schroeder's previous statement that Brooks had a poor ability to learn a new trade due to below average cognition was "not supportable by objective [evidence]."  Tr. 321.  Dr. Manos stated that "[o]ther evidence shows [Brooks] to respond in a very logical and succinct manner when believing she is not being evaluated for benefits."  Tr. 321.

On May 29, 2007, Brooks saw Dekui Zhang, M.D., at the Akron City Hospital Internal Medicine Center and complained of knee pain.  Tr. 464.  On exam Dr. Zhang noted tenderness, which was worse with passive movement, but no effusion, and referred her to St. Thomas

hospital for an MRI.  Tr. 464.  Bilateral knee MRIs showed small joint effusion and no evidence

of internal derangement.  Tr. 473, 474.  Brooks saw Dr. Zhang again on September 11, 2007, and

complained of being nervous all the time, feeling hot and sweaty, and having shortness of breath

with exertion.  Tr. 449.  Dr. Zhang continued Brooks on Tramadol for her arthritis and

Citalopram for her depression.  Tr. 450.

On October 19, 2007, Brooks had a follow up appointment with Dr. Murray, who noted

that Brooks' left knee pain was gone but right knee pain continued.  Tr. 470.  On exam, Dr.

Murray noted anterior lateral pain, mild tenderness along the lateral femoral condyle, no gross

crepitus and no instability.  Tr. 470.  He diagnosed right knee pain and noted there may be some

tissue injury which the MRI did not appreciate.  Tr. 470.  He recommended the next step for

Brooks would be arthroscopic surgery.  Tr. 470.

On March 25, 2008, state consultative psychologist Leidal evaluated Brooks for a second

time.  Tr. 408-14.  On examination, Dr. Leidal stated that Brooks was oppositional and her

motivation appeared questionable, and that she refused "to engage in most tasks associated with

the MSE and was a reluctant historian at best."  Tr. 410-11.  However, he stated that he saw no

overt signs of symptom magnification.  Tr. 410-11.  Dr. Leidal also found that Brooks was not

markedly distracted or impaired; that her memory appeared marginal; and that her vigilance and

effort were poor.  Tr. 411.  Brooks was able to count backwards from twenty; claimed she could

not count by threes; refused to attempt to recite the months of the year in reverse order; and

refused to attempt to spell "WORLD" backward, claiming to be unable to spell it forward.  Tr.

411.  Dr. Leidal noted that Brooks' acquired fund of information was deficient and estimated her

intelligence to be in the borderline to mildly mentally retarded range of intellectual functioning.

Tr. 411-12.  However, Dr. Leidal explained he did not advance a diagnosis of mild mental

5

retardation "due to a lack of collateral information that would substantiate diagnostic criteria (DSM-IV TR) for mental retardation prior to age 18.  Memory functions … appeared to be commensurate with intelligence."  Tr. 412.  He assigned a GAF scale score of 50[2] based primarily on Brooks' "major impairment in social and occupational functioning and judgment."  Tr. 412.  Dr. Leidal diagnosed depressive disorder not otherwise specified; borderline intellectual functioning; and passive-aggressive and dependent personality traits.  Tr. 413.  He opined that Brooks was no more than moderately impaired in her abilities to: (a) relate to others in an appropriate manner; (b) maintain attention and concentration to simple work-related tasks and pace in task completion; and (c) maintain employment, adapt to the work environment and tolerate work stressors, and complete a normal work day.  Tr. 413.  Dr. Leidal also opined that Brooks was not impaired in her ability to follow short, simple instructions.  Tr. 413.

The next month, on April 4, 2008, state agency reviewing psychologist Roseann Umana, Ph.D., assessed Brooks' mental RFC.  Tr. 417-34.  She documented: (a) borderline intellectual functioning; (b) depressive disorder, not otherwise specified; and (c) passive-aggressive and dependent traits.  Tr. 422, 424, 428.  Dr. Umana opined that Brooks had: (a) mild limitations in conducting activities of daily living; (b) moderate limitations in maintaining social functioning; and (c) moderate limitations in maintaining concentration, persistence, or pace.  Tr. 431.  She also stated that Brooks appeared to be "moderately restricted" in relating to co-workers or supervisors.  Tr. 419.  She further opined that Brooks appeared able to perform simple instructions and follow simple directions.  Tr. 419.

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

On April 28, 2008, state agency reviewing physician Charles Derrow, M.D., assessed Brooks' physical RFC.  Tr. 435-42.  He opined that Brooks could: (a) lift/carry 20 pounds occasionally and lift/carry 10 pounds frequently; (b) stand/walk/sit for about six hours per workday; and (c) kneel and crawl occasionally (Tr. 436, 437).  Dr. Derrow stated that Brooks' allegations were not credible due to the numerous discrepancies and lack of information from treating sources.  Tr. 436.

Brooks returned to Dr. Murray at the Orthopedic Clinic on May 30, 2008, complaining that her left knee pain was worse than the right and that physical therapy had not improved it. Tr. 469.  Brooks declined knee injections but stated that she wished to proceed with arthroscopic surgery.  Tr. 469.  On exam, Dr. Murray noted no effusions, some pain with stressing of the patellofemoral joint, joint line pain on the left, and stability bilaterally.  Tr. 469.

On October 17, 2008, Brooks saw Jameel Chohan, M.D. at the Internal Medicine Center following a hospitalization for exacerbation of COPD.  Tr. 486.  Dr. Chohan noted that Brooks became tearful when discussing her reluctance to use insulin, and he noted that Brooks needed to find a job "so she can obtain long acting inhaled corticosteroid and anti-cholinergic bronchodilator" for her chronic bronchitis.  Tr. 488.  X-rays of Brooks' knees from October 27, 2008 showed the bones to be well mineralized and the joint spaces maintained.  Tr. 485.

Brooks saw Christopher Karakasis, M.D., at the Internal Medicine Center on January 29, 2009, complaining of bilateral knee pain.  Tr. 595.  On exam, Dr. Karakasis noted that Brooks had pain with passive movement of the knees, point tenderness to palpation, and minor effusion of the left knee.  Tr. 596.  Dr. Karakasis started Naproxen and Tylenol for the knee pain and referred Brooks to physical therapy.  Tr. 596.

On February 17, 2009, Brooks was referred to David E. Richter, M.D., a rheumatologist, for her pain symptoms.  Tr. 593-94.  Brooks complained of pain in her knees and described the pain as constant and throbbing.  Tr. 593.  Dr. Richter reviewed the x-rays that had been taken of Brooks' knees and found that the x-rays were normal.  Tr. 593.  On examination, Dr. Richter noted that Brooks had a lot of pain on knee flexion, resulting in slightly limited range of motion, but stated that there was no effusion or edema present.  Tr. 593.  He noted that her examination was otherwise unremarkable.  Tr. 593.  Dr. Richter stated that Brooks may have early osteoarthritis of her knees but that her symptoms were "greater than objective change."  Tr. 593.

On May 22, 2009, Brooks saw Alison Bates, M.D. at the Internal Medicine Center, on follow-up from hospitalization for possible transient ischemic attack. Tr. 589.  Dr. Bates noted that the neurologist had suspected that Brooks' paresthesia may have been related to her diabetes. Tr. 589.  Dr. Bates observed that Brooks had diminished temperature sensation over the lower extremities. Tr. 590.  She also noted that Brooks would likely benefit from diabetic educational assistance with a dietician.  Tr. 591.

On October 12, 2009, Brooks saw Diane Duff, CRNP, at the Internal Medicine Center and complained of bilateral knee pain and depression.  Tr. 611.  On exam, her knees showed tenderness and painful range of motion but no swelling.  Tr. 612.  Nurse Duff referred Brooks to an orthopedic consult.  Tr. 612-13.

Brooks saw Dr. Aaron Haynes at the Internal Medicine Center on May 17, 2010, and requested a functional capacity evaluation for her disability claim.  Tr. 746.  Dr. Haynes stated that he did not feel that Brooks "is disabled at this time from a medical standpoint" and that she "may need a knee replacement" but had not had recent x-rays of the knee.  Tr. 748.  He referred Brooks to Portage Path Behavioral Health for her depression.  Tr. 748.

8

On July 16, 2010, Brooks underwent a psychiatric evaluation with Raman Baishnab, D.O.  Tr. 810-13.  On exam, Brooks was occasionally tearful appropriately; had depressed mood and congruent affect; and had intact cognition and average fund of knowledge.  Tr. 812.  Dr. Baishnab stated that Brooks "has literacy deficits; however, it is unclear if [she] has any learning disability." Tr. 812.  He diagnosed depressive disorder not otherwise specified; anxiety disorder not otherwise specified; rule out major depressive disorder, recurrent, severe with history of psychotic features; history of cannabis dependence; and assigned GAF scores of 55 currently and a high of 65 in the past year.[3]  Brooks returned to Dr. Baishnab on August 6, 2010.  Tr. 808-09.  At that time, he noted that Brooks had poor literacy and felt very self-conscious and had very low self-esteem.  Tr. 808.  He also noted she was not assertive in life, was unable to ask for help or support she needed, and felt hopeless and purposeless. Tr. 808.

On August 31, 2010 Dr. Baishnab completed a Mental RFC Questionnaire and reported that he met with Brooks about every two weeks since treatment began on July 16, 2010.  Tr. 814.  He repeated the diagnoses and GAF scale scores as set forth above.  Tr. 814.  He also stated that Brooks was not a malingerer.  Tr. 815.  Dr. Baishnab then opined that Brooks would likely miss work about three days a month because of her impairments.  Tr. 816.  He also found that Brooks had moderate limitations in: (a) conducting activities of daily living; (b) maintaining concentration, persistence, or pace; and (c) maintaining regular attendance and being punctual within customary, usually strict tolerances.  Tr. 816.  In addition, he found that Brooks exhibited marked impairment in maintaining social functioning.  Tr. 816.

---

[3] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

### C.    Administrative Hearing

#### 1.    Brooks' Testimony

On September 1, 2010, Brooks appeared with counsel and testified at a hearing before the ALJ.  Tr. 49-67.  She testified about her previous employment and stated that she did general cleaning for a business in 2008.  Tr. 52.  Brooks explained that her job duties included taking out the trash, dusting, mopping, and general cleaning.  Tr. 52.  She said that she worked at that job on a part-time basis for approximately three months but had to quit because she could not stand and do the work.  Tr. 53.  Brooks also stated that she worked in a hospital cafeteria from 1999 to 2004.  Tr. 53.  She reported that she was fired from that job for calling off work.  Tr. 55.

Brooks testified that she could not work because she could not do a lot of walking and standing.  Tr. 66.  She reported having weak, painful knees, and she stated that the last time she went to the doctor for her knees had been one year prior to the hearing.  Tr. 56.  She testified that walking "half a block" would be "pushing it."  Tr. 66.  Brooks also stated that she got cortisone shots and took pain medication for her knee pain.  Tr. 56-57.  She took Zoloft for depression and attended counseling sessions once per week.  Tr. 62.  She testified that, with breaks, she could cook and shop for groceries.  Tr. 65-66.  Brooks said that she spent most of the day watching television.  Tr. 66.

#### 2.    Vocational Expert's Testimony

Evelyn Sindelar appeared at the hearing and testified as a vocational expert (the "VE"). Tr. 67-77.  She stated that Brooks had previously worked as a cafeteria worker, which was an unskilled position at a light exertional level, and a housekeeper, which was an unskilled position at a medium exertional level.  Tr. 68-69.  The ALJ then asked the VE whether a hypothetical individual with Brooks' vocational characteristics and the following limitations could perform

any of Brooks' past relevant work:

> [A]ble to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk six hours of an eight hour work day, is able to sit for six hours of an eight hour work day; has unlimited push and pull, and can occasionally kneel and crawl.

Tr. 70. The VE responded that the hypothetical person could perform Brooks' past relevant job of cafeteria worker. Tr. 70. The ALJ then asked the VE to consider a person who had the aforementioned limitations with the additional restriction that the individual could perform simple instructions and follow simple directions. Tr. 70. The VE testified that this hypothetical person could also perform Brooks' previous job as a cafeteria worker. Tr. 70-71.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

The ALJ determined that Brooks met the insured status requirements of the Social Security Act through December 31, 2008.  Tr. 12.  At Step One of the sequential analysis, the ALJ determined that Brooks had not engaged in substantial gainful activity since July 22, 2003, the alleged onset date.  Tr. 12.  At Step Two, she found that Brooks had the following severe impairments: osteoarthritis with secondary bilateral knee pain and low back pain, chronic obstructive pulmonary disease, diabetes mellitus type II, borderline intellectual functioning, depressive disorder, and personality disorder.  Tr. 12-13.  At Step Three, the ALJ found that Brooks did not have an impairment or combination of impairments that met or medically equaled

one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[4]  Tr. 13.  The ALJ then

determined Brooks' RFC and found that she could perform less than a full range of light work

with the following restrictions:

> [S]he is able to occasionally lift 20 pounds and frequently lift 10 pounds, is able
> to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-
> hour workday, has the unlimited ability to push and pull, can occasionally kneel
> and crawl, and is limited to performing simple instructions and following simple
> directions.

Tr. 18-19.  Tr. 14.  At Step Four, the ALJ found that Brooks was able of performing her past

relevant work as a cafeteria worker.  Tr. 19.  Accordingly, the ALJ concluded that Brooks was

not disabled.  Tr. 19-20.

## V.  Arguments of the Parties

Brooks argues that the ALJ's RFC determination is not supported by substantial

evidence.  In response, the Commissioner contends that substantial evidence supports the ALJ's

RFC determination.

## VI.  Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[4]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration
considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,
education, or work experience.  20 C.F.R. § 404.1525.

1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ's RFC Determination**

Brooks takes issue with both the physical component and the mental component of the ALJ's RFC determination. Her arguments shall be addressed in turn.

> **1.      Substantial Evidence Supports the ALJ's Determination that Brooks Could Perform Light Work**

Regarding her physical RFC, Brooks argues that the ALJ erred in finding that she was capable of performing light work. Doc. 13, p. 16. Specifically, Brooks argues that the record contains no evidence that she is capable of prolonged standing and walking, as required for light work. Doc. 13, p. 16. Contrary to this argument, the ALJ's determination that Brooks could perform light work is supported by substantial evidence.

A claimant's RFC is a measure of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on the relevant evidence. 20 C.F.R. §§ 404.1545, 404.1546(c). In reaching an RFC determination, the ALJ may consider both medical and non-medical evidence. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). It is not the court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at

14

387. Thus, even if substantial evidence supports an RFC determination different than that found by the ALJ, the Court must nevertheless affirm so long as substantial evidence also supports the ALJ's position. *See Jones*, 336 F.3d at 477.

There is substantial evidence in the record to support the ALJ's determination that Brooks retained the RFC to perform light work subject to certain restrictions. Diagnostic testing and treatment records do not support disabling functional limitations with respect to standing and walking during the relevant time. Instead, they illustrate an array of normal, relatively benign findings. For example, in late 2006, bilateral knee x-rays showed no fracture or dislocation, normal joint space, no significant soft tissue abnormality, and no significant bone-on-bone pathology. Tr. 472, 826. In May 2007, bilateral knee MRIs showed no more than small joint effusion and no evidence of internal derangement. Tr. 822-23. More than a year later, in July 2008, examination notes showed 5/5 strength in Brooks' bilateral lower extremities. Tr. 468. In October 2008, bilateral knee x-rays revealed that Brooks' bones were well mineralized and joint spaces were maintained. Tr. 485. In February 2009, Dr. Richter, a treating rheumatologist, noted that Brooks had normal knee x-rays. Tr. 593. He also stated that there was no effusion or edema present despite Brooks' allegation of swelling, and that Brooks' symptoms appeared "greater than objective change." Tr. 593. Furthermore, a May 2009 EMG of Brooks' legs was normal and showed "[n]o signs of significant abnormality." Tr. 520. Additionally, treatment notes from October 2009 indicated no reported swelling, redness, or warmth but painful range of motion. Tr. 679. And, in early 2010, after experiencing left ankle pain after a fall, Brooks was in "no acute distress whatsoever" and x-rays were negative for fracture. Tr. 819, 853. In May 2010, Dr. Hayes, a treating physician, addressed Brooks' knee arthritis and opined that Brooks was not disabled from a medical standpoint. Tr. 748.

Moreover, the opinions of the state agency reviewing physicians directly support the ALJ's RFC determination.  Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  In April 2007, state agency reviewing physician Dr. Manos found that Brooks could: (a) lift/carry 20 pounds occasionally and lift/carry 10 pounds frequently; (b) stand/walk/sit for about six hours per workday; and (c) kneel and crawl occasionally.  Tr. 316-18.  Dr. Manos stated that her assessment was based on objective physical findings and also noted that Brooks' statements were not credible due to numerous discrepancies in the record.  Tr. 316, 320.  One year later, state agency reviewing physician Dr. Derrow likewise opined that Brooks could: (a) lift/carry 20 pounds occasionally and lift/carry 10 pounds frequently; (b) stand/walk/sit for about six hours per workday; and (c) kneel and crawl occasionally.  Tr. 436, 437.  And, like Dr. Manos, Dr. Derrow stated that Brooks' allegations were not credible due to the numerous discrepancies in the record.  Tr. 440.

All of this evidence supports the ALJ's determination that Brooks could perform light work.  In her reply brief, Brooks argues that there is also substantial evidence in the record that would support a different, more restrictive physical RFC and, ultimately, a finding of disability.  Doc. 18.  For example, Brooks points to evidence that she claims shows that she had difficulties with ambulation and decreased range of motion in her knees.  Doc. 18, pp. 3-4.  As noted by the Sixth Circuit, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 (citations omitted).  Here, the ALJ reviewed the entire record, weighed the evidence, and

16

concluded that Brooks retained the ability to do light work.  Even assuming there is evidence in the record that supports Brooks' claim that she is more limited that found by the ALJ, it is also true that substantial evidence supports the ALJ's conclusion that Brooks could perform light work.  Based on the applicable standard of review, the ALJ's physical RFC determination should be affirmed.

### 2.       Remand is Appropriate Because the ALJ Failed to Consider the Opinion of Treating Physician Dr. Baishnab in Assessing Brooks' Mental RFC

Regarding her mental RFC, Brooks argues that the ALJ's failure to consider the opinion of her treating psychiatrist, Dr. Baishnab, in reaching her mental RFC determination was error requiring reversal and remand.  Doc. 13, pp. 17-18.  In particular, Brooks contends that the ALJ erred because she failed to state the weight she assigned to the opinion of Dr. Baishnab or explain why she rejected this opinion, in violation of the treating physician rule.  Doc. 13, p. 17.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

As discussed above, Dr. Baishnab completed a mental RFC questionnaire for Brooks on August 31, 2010.  Tr. 814-16.  He diagnosed Brooks with depressive disorder not otherwise specified and anxiety disorder not otherwise specified and assigned Brooks a GAF score of 55. Tr. 814.  Dr. Baishnab stated that Brooks was not a malingerer.  Tr. 815.  He then opined that Brooks would be absent from work about three days a month because of her impairments.  Tr. 816.  Dr. Baishnab also opined that Brooks had moderate limitations in: (a) conducting activities of daily living; (b) maintaining concentration, persistence, or pace; and (c) maintaining regular attendance and being punctual within customary, usually strict tolerances.  Tr. 816.  He further opined that Brooks had marked impairment in maintaining social functioning.  Tr. 816.

Upon review, the undersigned concludes that the ALJ's treatment of Dr. Baishnab's opinion was inadequate under the treating physician rule and necessitates remand.  The ALJ's only references to Dr. Baishnab's opinion in her decision were in her analysis under Step Three of the sequential analysis.[5]  Tr. 15-16.  Specifically, the ALJ referred to Dr. Baishnab's opinion

---

[5] The ALJ refers to the Mental RFC Assessment completed by Dr. Baishnab as an assessment from Dr. Durner.  Tr. 15-17.  It appears that this confusion is based on the signature page of Brooks' initial psychiatric evaluation, which was signed by both Dr. Baishnab and Dr. Durner, who was the attending physician.  Tr. 813.  The ALJ's reference to the opinion of Dr. Durner is therefore construed as a reference to the opinion of Dr. Baishnab.

as a basis for rejecting Dr. Leidal's 2006 opinion, in which Dr. Leidal found that Brooks was markedly impaired in: (a) relating to others in an appropriate manner; (b) maintaining attention and concentration to simple work-related tasks and pace in task completion; and (c) maintaining employment, adapting to the work environment and tolerating work stressors, and completing a normal work day.  Tr. 15-16.  The ALJ also referenced Dr. Baishnab's opinion in her discussion of the Paragraph A criteria for Listing 12.04 and Listing 12.08.  Tr. 15-16.

However, the ALJ did not discuss Dr. Baishnab's opinions with regard to Brooks' functional abilities anywhere in her decision.  Notably, Dr. Baishnab opined that Brooks had **marked** limitations in maintaining social functioning and that she would miss work about three times per month because of her impairments.  The ALJ found no limitations in any of these areas in her RFC determination.  It would therefore appear that the ALJ rejected Dr. Baishnab's opinion.  However, the ALJ did not explain the weight she gave to Dr. Baishnab's opinion regarding Brooks' functional abilities or provide any reasons for rejecting that opinion.  Under the treating physician rule, Dr. Baishnab's opinions with regard to Brooks' functional abilities were entitled to controlling weight as long as they were medically supported and were consistent with the other evidence in the record.  *Wilson*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  The ALJ's failure to identify the reasons for discounting a treating source's opinion and to explain precisely how those reasons affected the weight given to the treating source's opinion signifies a lack of substantial evidence.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 407 (6th Cir. 2009).  This holds true even where the conclusion of the ALJ may be justified based upon the record.  *Id.*  The Sixth Circuit has repeatedly cautioned that courts "will not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion, and . . . will continue remanding when encounter[ing]

19

opinions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545).  The ALJ's failure to provide any explanation as to what weight he gave Dr. Baishnab's opinion and her failure to give good reasons for disregarding that opinion are procedural errors that denote a lack of substantial evidence supporting the ALJ's decision. Remand is therefore appropriate so that the ALJ can properly evaluate Dr. Baishnab's opinion under the treating physician rule.

Notwithstanding the foregoing, the Commissioner argues that any error committed by the ALJ in reaching her RFC determination was essentially harmless because her determination was supported by the record as a whole.  Doc.  17, pp. 10-12.  This argument is unpersuasive. Application of harmless error may be appropriate where the review of a decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.  *See Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 64298, *26-27 (N.D. Ohio June 17, 2011).  Here, Dr. Baishnab opined that Brooks had moderate limitations in concentration, persistence, and pace, marked limitations in maintaining social functioning, and that she would miss about three days of work per month because of her limitations.  If these findings are entitled to controlling weight, they could change the outcome of this case under the sequential analysis.[6]  Thus, the ALJ's failure to explain what weight he gave to Dr. Baishnab's opinion or provide any reasons for rejecting that opinion was

---

[6] Counsel for Brooks attempted to incorporate the limitations set forth by Dr. Baishnab into a hypothetical question to the VE at the administrative hearing.  Tr. 74.  Counsel stated: "[T]his person would be absent from work about three days per month, and then I would add again occasional problems with pace and persistence, which I would interpret again to mean no fast-paced or high production, and occasional problems with attendance and punctuality…."  Tr. 74-75.  The VE responded that the hypothetical individual would not be able to return to Brooks' past work or perform any other jobs available in significant number in the national economy.  Tr. 75.  Had the ALJ adopted those limitations, the outcome of this case could have been different.  Thus, the ALJ's failure to discuss the limitations set forth by Dr. Baishnab and explain why she rejected these limitations was prejudicial to Brooks.

20

prejudicial to Brooks because, had she followed the treating physician rule, the outcome of the case could have been different.  The Commissioner's *post hoc* rationale is not a sufficient substitute for a reasoned analysis by the ALJ in this case.

In sum, the ALJ failed to follow the treating physician rule because she did not assign any weight to the opinion of Dr. Baishnab or provide any good reasons for discounting that opinion.  The ALJ's failure to explain her decision with regard to the opinion of Dr. Baishnab has, in turn, deprived the Court of the ability to conduct a meaningful review of the ALJ's decision.  Accordingly, the undersigned recommends that the case be remanded for proper application of the treating physician rule to Dr. Baishnab's opinion.

Finally, Brooks argues that the ALJ improperly evaluated the opinions of state consultative examiner Dr. Leidal and state reviewing physician Dr. Umana.  Doc. 13, pp. 18-20.  This Report and Recommendation does not address these arguments because, on remand, the ALJ's evaluation of Dr. Baishnab's opinion under the treating physician rule may impact her findings with regard to Brooks' RFC, as well as her findings under the remaining steps of the sequential analysis.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 WL 841538, at *7 (N.D. Ohio March 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).  It should be noted, however, that opinions from agency medical sources are considered opinion evidence.  20 C.F.R. §§ 404.1527(e), 416.927(e).  The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from

treating sources, nontreating sources, and other nonexamining sources who do work for us." 20

C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

Noreen L. Brooks' SSI and DIB applications should be **REVERSED and REMANDED.**[7]

Dated: January 4, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[7]  This Report and Recommendation should not be construed as an advisory opinion favoring a finding of disability
on remand.